## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

09/06/2017, 10:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Evan K. Hammond
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

E.L.R. and E.J.R. (Minor Children)

And

J.R. (Father),

*Appellant-Respondent,*

     v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 6, 2017

Court of Appeals Case No. 27A02-1704-JT-694

Appeal from the Grant Superior Court

The Honorable Dana J. Kenworthy, Judge

Trial Court Cause No. 27D02-1601-JT-1 & 27D02-1601-JT-3

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.R. (Father), appeals the trial court's Order terminating his parental rights to his minor children, ELR and EJR (collectively, Children).

We affirm.

# ISSUE

Father presents us with two issues on appeal, which we consolidate and restate as the following single issue: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Father's parental rights.

# FACTS AND PROCEDURAL HISTORY

C.N. (Mother)[1] and Father are the biological parents of ELR, born on May 20, 2008, and EJR, born on June 9, 2009. Mother and Father were never married and Father established paternity for the Children by executing a paternity affidavit. The Children were in Father's care and custody until January 2013 when he became incarcerated on a charge of domestic abuse committed against his then-wife, while the Children were in the house. As a result of this allegation, a no-contact order was issued against Father, prohibiting him to

---

[1] Mother voluntarily relinquished her parental rights to the Children. Facts pertaining to Mother will be included in so far as they are relevant to Father's appeal.

contact the Children. After Mother received custody over the Children in January 2013, the Children resided with her and Mother's then-husband, C.N. (Stepfather). Mother and Stepfather have one child together, C.N., Jr.[2]

[5] On November 16, 2016, DCS received a report alleging that EJR had a bruise on his neck and forehead. The bruise on his neck was described as being dark purple and consistent with a thumb print, while the bruise on EJR's forehead was yellowish and fading, with the knot from the injury still being visible. According to the report, EJR stated that "his [M]other [had] picked him up by his neck and threw him across the room." (DCS Exh. 1, pp. 3-4). The report indicated that Mother and Stepfather frequently abandoned all three children for at least a week. The home had no running water and no plan to reestablish utilities as Mother and Stepfather were both addicted to illegal substances and could not afford to pay the water bill. As a result of DCS's investigation into Mother's abuse, the Children became the subject of a court-approved Informal Adjustment (IA). During the IA, the Children resided with Mother and Stepfather, while DCS provided home-based case management and conducted a parenting assessment.

[6] As part of the IA, DCS's family case manager, Cassandra Brubaker (FCM Brubaker), frequently visited the home. During these visits, she saw a home in "chaos." (Transcript p. 188). "The boys were out of control[.]" (Tr. p. 188).

---

[2] Mother, Stepfather, and C.N., Jr. are subject to separate proceedings. Facts with respect to those proceedings will be included in so far as they are relevant to the case before us.

They would kick, and jump into walls, "thinking they could go through walls." (Tr. p. 191. The boys would also "climb up on the couch, get on the window sill and then jump on [FCM Brubaker's] shoulders. They'd pick up the dog and throw the dog and kick the dog." (Tr. p. 191). To keep the Children in their bedrooms at night, Mother and Stepfather had installed locks on the outside at the top of the door. After expressing her concern several times without any change, FCM Brubaker bought door alarms which she made Stepfather install.

[7] Jeannette Hoeksema (Hoeksema), a therapist with Family Service Society, conducted the parenting assessment. She observed the Children to be "very physically aggressive toward myself, toward [Stepfather], toward each other." (Tr. p. 136). "[EJR] kicked [Hoeksema]. [EJR] then kicked [Stepfather] who ran after [EJR] and kicked him in response." (Tr. p. 137). ELR would climb on Hoeksema's shoulders, "standing on [her] with his feet." (Tr. p. 137). She noticed that "there were times that there was no response to the [C]hildren's aggression toward [Hoeksema] and toward each other. There were times where [Stepfather] intervened, but that didn't stop the physical aggression." (Tr. p. 137).

[8] As part of the IA, Mother and Stepfather were required to receive DCS's approval to leave the Children with any other caregiver. Mother and Stepfather ignored this condition and allowed the Children to spend nights with a relative, where the Children were sexually abused by a member of the relative's household. Due to this incident, as well as other concerns voiced during the IA, DCS filed petitions on June 30, 2014, alleging the Children to be Children

In Need of Services (CHINS). Although the CHINS petitions allowed the Children to remain in the home with Mother and Stepfather, its purpose was "[t]o provide more intensive services for the [C]hildren and the parents and to have a court intervention, . . . and hope to get the [C]hildren more services." (Tr. p. 194).

[9] On September 2, 2014, DCS removed the Children from the home after Mother was arrested for domestic battery. DCS placed the Children with Stepfather, who entered into a safety plan not to let Mother have contact with the Children outside the supervised visitations. Nevertheless, Mother entered the home and choked EJR. Consequently, on September 18, 2014, the Children were removed from Stepfather's care and placed with foster parents, pursuant to an order authorized by the trial court. Even though Father had been released from prison since approximately January 17, 2014, the Children were not placed with him because of the no-contact order that was still in effect.

[10] On October 16, 2014, Father was placed under a dispositional decree and the trial court ordered him to participate in reunification proceedings, which included: maintain regular, weekly contact with FCM Brubaker; keep all appointments with service providers and FCM Brubaker; maintain suitable, safe, and stable housing and household necessities; secure and maintain a legal and stable source of income; comply with the terms of probation in the criminal case; comply with the no-contact order; and to participate in and successfully complete a domestic violence assessment, and to follow all other recommendations. Despite the trial court's order, Father's contact with the

DCS was minimal. Besides participating in a parenting assessment in April 2015, FCM Brubaker recalled some limited phone contact in early 2015.

[11] At the April 9, 2015 dispositional hearing, the trial court found that Father had failed to comply with court orders, had not enhanced his parental abilities, and had failed to cooperate with DCS. For approximately one month after the dispositional decree, from April 2015 until May 2015, Father had bi-weekly contact with FCM Brubaker. During that time, he completed a substance abuse assessment and a parenting assessment with Hoeksema. Hoeksema concluded that Father's "truthfulness scale score was what was called the problem risk range so that suggests that there was what they call distortion in answers in an attempt to present him in an overly favorable light." (Tr. p. 145). Father's assessment revealed that his "violent scale was in the [] medium risk range[,]" indicating that Father "is impatient, easily annoyed, and [has] a rather low frustration tolerance." (Tr. p. 145). As a result of the assessment, Hoeksema recommended additional testing for Father, as well as a psychological evaluation. Father never followed up on these recommendations.

[12] On May 21, 2015, the trial court conducted a permanency hearing in the CHINS proceedings and found Father not in compliance with the case plan that he had just recently started participating in, and had not adhered to the recommendations made as a result of DCS's services. Therefore, the trial court ordered Father to complete a psychological evaluation and complete all recommendations resulting from that evaluation. The trial court approved DCS's request to change the permanency plan and initiate the termination of

parental rights. Starting June 2015, Father ceased all contact with FCM Brubaker and stopped all participation in court-ordered services.

[13] In late June or early July 2015, Father was arrested in Iowa and extradited to Grant County, Indiana, on a Level 5 felony theft charge and two Class B misdemeanors for criminal mischief and false informing, respectively. These charges resulted in a revocation of his probation in his previous battery conviction. At the time of the termination hearing, Father was incarcerated with no scheduled release date.

[14] On August 6, 2015, and February 4, 2016, the trial conducted periodic case reviews and determined both times that Father had not complied with the Children's case plan and affirmed the permanency plan of adoption. On January 27, 2016, DCS filed a petition to terminate Father's parental rights to his Children. From February through August 2016, the trial court conducted five evidentiary fact-finding hearings at which Father appeared in the custody of law enforcement personnel.

[15] During the fact-finding hearings, the trial court received testimony from, among others, the Children's foster mother and therapist. Lucretia Swan (Swan), the Children's foster mother, described the Children's behavior and progress after DCS placed them in her care and custody. The initial safety plan called for an adult to be in the room with the Children at all times because of their violent nature towards each other. "Several times," Swan found "them choking each other." (Tr. p. 113). The Children acted out sexually, "constantly waving their

penises at each other, pulling their pants down, and waving it, asking [Swan's] grandchildren to pull their pants down, so some sexual acting out there." (Tr. p. 117). Swan advised that "[t]he one thing that has worked for them is structure." (Tr. p. 120). Being a foster mother to ELR for two years, she first met him when he was "a very angry child. He [was] a bully and he [was] going to hit the other kids." (Tr. p. 114). Re-evaluating ELR at the time of the hearing, Swan explained that he is "doing better. [ELR] still has anger issues which he works on in counselling." (Tr. p. 115). Swan only remained a foster parent to EJR for one year before she requested his placement elsewhere. Although she tried numerous times to bring EJR back into the house, he "couldn't sustain himself." (Tr. p. 112). During the one year EJR was in her care, EJR was "uncontrollable." (Tr. p. 112). He was defiant. "[EJR] threatened people to kill him. He tried to stab [Swan] with a knife and then when he came back in May, he threatened to kill us all in our sleep." (Tr. p. 112). EJR was seven years old at the time.

[16] Sandra Duecker (Duecker) has been the Children's therapist since October 27, 2014. Upon initial evaluation, Duecker diagnosed ELR with post-traumatic stress disorder. "He ha[d] a lot of problems with emotional regulation. He could not manage his emotions. He couldn't identify how he felt, what he thought he ought to do." (Tr. p. 161). As a result, "[h]e was having a hard time functioning in all social relationships, teachers, peers, brothers, all those kinds of areas." (Tr. p. 161). After working with ELR regularly once a week for over two years, Duecker sounded hopeful and indicated that he made a

"tremendous improvement." (Tr. p. 165). She clarified that ELR "can now sometimes identify how he's feeling and talk about ways he can cope with that, things he can do. His behavior is just totally different." (Tr. p. 164). "He smiles. He laughs. He gets mad. He has a normal range of emotions that he can exhibit and they seem to match the activity and the event." (Tr. p. 164). Duecker added that ELR's "empathy has gone way up when it even comes to his younger brother." (Tr. p. 165). Overall, she opined that "the majority of the fact that he feels good about himself has to do with where he's been living and the kind of care he's been receiving on that steady, regular emotional" basis. (Tr. p. 166). She recommended placement in a family trained in and understanding of trauma, who show warmth and consistency, and who are very patient and totally committed to his needs.

[17] Turning to EJR, Duecker explained that he "is a very different picture." (Tr. p. 168). When she first evaluated EJR, she considered him "much more disturbed than [ELR] was." (Tr. p. 169). EJR "couldn't look you in the eye. His activity level was extreme. His anxiety level was so high that he would just buzz from event to event to activity to activity. He would laugh inappropriately. He would get mad over nothing." (Tr. p. 169). After working with him, Duecker thought "he got better for a period of time and [she] was really hopeful." (Tr. p. 171. But "then he just seemed to fall apart and start getting more aggressive toward those that [] he really cared for. . . . [I]t was almost as if he was allergic to that feeling and then he would overreact in a violent way." (Tr. p. 171). Duecker's overall prognosis for EJR was cautiously optimistic. While she

thought there was a "possibility that he can get better," it was "much different than [ELR's] hopefulness level." (Tr. p. 177). She indicated the need for intensive therapy and placement with a highly trained family with little expectation that EJR will reciprocate. At the time of the termination hearings, EJR was placed at Youth Opportunity Center, a residential treatment center, to stabilize his behavior and conduct further assessments to better understand his needs.

[18] John Key, the Court Appointed Special Advocate for the Children (CASA Key), testified that the Children are "on a track that is very positive[.]" (Tr. p. 245). He advised the court that the Children have made "incredible progress in behavior and academically." (Tr. p. 245). Indicating that the stability that the Children received in not having had parental visits was a positive influence on their progress, CASA Key cautioned that "whenever they have a change where they come back to something that was in their past, they just regress, and they can't afford to go back." (Tr. p. 245).

[19] During the hearing, Father testified that he last saw the Children in January of 2013. He requested the trial court to place the Children with his new wife, L.R., whom he had married while he was incarcerated and with whom he had an eighteen-year-old son. He explained that the Children had been "very young" when they had initially met L.R., and he was unsure they would even recognize her. (Tr. p. 99). He admitted that "[t]here would almost be a question of recognizing me at this point. It's been almost four years." (Tr. p. 108).

On March 8, 2017, the trial court issued its Order terminating Father's parental rights. The trial court concluded, in pertinent part, that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement out of Father's custody will not be remedied; there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being; and termination of Father's parental rights is in the Children's best interests.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Father appeals the trial court's termination of his parental rights. A parent has an "interest in the care, custody, and control of his or her children [that] is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution thus safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, it is well established that "parental rights are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Termination of parental rights is appropriate where "parents are unable or unwilling to meet

their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We appreciate that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[23] Upon review of a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Additionally, the trial court issued specific findings of fact and conclusions thereon, which requires application of the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

[24] To support the termination of a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a certain period, and

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to establish each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260.

[25] On appeal, Father does not challenge the trial court's conclusions that the Children have been removed from their care for the requisite time or that DCS has established a satisfactory plan for the Children's care and treatment going forward. Rather, he contends that there is insufficient evidence to support the trial court's conclusions that there is a reasonable probability either that the conditions resulting in the Children's removal and continued placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children's well-being[3] and that termination is in the Children's best interests. We address each argument in turn.

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, DCS did not allege that the Child has been twice adjudicated a CHINS. Therefore, the relevant inquiry

## A. *Remediation of Conditions*

In considering whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Children's "placement and retention" outside of the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

---

is whether DCS established the existence of a reasonable probability either that the conditions resulting in the Child's removal or continued placement outside the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being.

[27] According to Father, the evidence does not support a conclusion that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement out of the home will not be remedied. Without challenging any of the trial court's findings, he argues that he was incarcerated during a majority of these proceedings. However, he asserts that the evidence establishes that "[o]nce released from incarceration," he "completed the drug and alcohol assessment and parenting assessment that he was directed to do." (Appellant's Br. p. 16). He noted that, even though he is incarcerated, the Children need not be placed in foster care, but instead should be placed with his new wife during the time period that [he] remains incarcerated" as it "would provide the stability and permanency the [C]hildren need." (Appellant's Br. p. 17).

[28] Father insists that the present case is analogous to *Rowlett v. Vanderburgh County OFC,* 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), *trans. denied,* wherein this court determined that termination of a parent's rights was inappropriate because the parent, who was incarcerated throughout the entire termination proceedings and for all but two months of the CHINS proceedings, and was set to be released six weeks after the hearing, had made a good faith effort to better himself as a person and as a parent. He participated in services, took classes in parenting skills, domestic violence and substance abuse. *Id.* He had an established relationship with the children by sending them letters and calling them. *Id.* Recognizing that the parent had made positive strides while incarcerated, we concluded that "at this point in time," there was no clear and

convincing evidence that the conditions that had mandated the removal would not be remedied.  *Id*. at 623-24.

[29]     Father's arguments largely amount to a request to reweigh the evidence, which we decline to do.  *See In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Furthermore, we find that the evidence and the trial court's unchallenged findings establish that this case is distinct from *Rowlett* in that during part of the CHINS and termination proceedings, Father was released from incarceration, *i.e.*, from January 17, 2014 until July 2015, and participated in some of DCS's services until he finally ceased all cooperation even before he was incarcerated again.  Although Father brazenly asserts that the reasons for removing the Children in the first place only related to Mother, the trial court, based on the unchallenged findings, clearly concluded that "Father's habitual patterns of conduct demonstrate his lack of commitment to fulfilling his parental obligations to his [C]hildren." (Appellant's App. Vol. II, p.68).

[30]     The uncontested evidence reflects that during the seventeen-month period Father was not incarcerated, Father's participation and involvement with DCS was minimal, to almost non-existent.  Even though the trial court's dispositional decree of October 16, 2014 had entered parental participation orders, Father did not begin any services until approximately April 2015, more than a year after his initial release.  For about one month, Father had bi-weekly contact with FCM Brubaker.  During that time, he also completed a substance abuse assessment and a parenting assessment, which reflected Father's

tendency to minimize his violent nature and criminal history. Although additional testing had been court-ordered, Father failed to pursue any other services or to maintain contact with DCS.

[31] Blaming the non-existent relationship with his Children on the no-contact order that remained effective during the entirety of these proceedings, we note that Father was not precluded from maintaining contact with FCM Brubaker, or participating in his court-ordered services. Instead of being pro-active in attempting to remain in the Children's lives by following DCS's recommendations, Father spreads the responsibility everywhere except himself. Although Father requested to place the Children with L.R. while awaiting his release from incarceration, Father himself testified that he was unsure the Children would remember her from previous interactions when they were much younger. In light of the therapist's statement that the Children need to be placed in a home with stability and experience dealing with traumatic youth, and the CASA's reflection that the Children's behavioral progress was the greatest during times when they broke with their past, the trial court properly concluded that placement with L.R. would "not be a good option for the boys." (Appellant's App. Vol. II, p. 68). We affirm the trial court's sentiment that "[p]lacement with Father's wife does not address Father's failure to follow through with [c]ourt-ordered services and fulfill his own parental obligations . . . nor does it address Father's recurring criminal behavior, including crimes of domestic violence in the presence of the [C]hildren." (Appellant's App. Vol. II, p. 68). It is clear that Father refused to prioritize the needs of his Children by

failing to implement lasting changes to ensure that the Children would not suffer any future neglect. As such, the trial court did not err as there is sufficient evidence of a reasonable probability that the conditions resulting in the Children's removal and continued placement outside the home will not be remedied.[4]

### B. *Best Interests*[5]

[32] When considering the best interests of a child, we recognize that the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. "[C]lear and convincing evidence need not reveal that the continued custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (quoting *Bester*, 839 N.E.2d at 148). To determine whether termination is in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. In formulating its determination, the "trial court must subordinate the interest of the parent to those of the child." *In re J.C.*, 994 N.E.2d 278, 290

---

[4] Based on this determination, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21.

[5] Although Father failed to formulate a Best Interests argument, we will address whether the termination is in ELR and EJR's best interests because of "the parent-child relationship is one of the most valued relationships in our culture." *In re D.L.M.*, 725 N.E.2d 981, 983 (Ind. Ct. App. 2000).

(Ind. Ct. App. 2013), *reh'g denied*. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d at 648 (quoting *K.T.K.*, 989 N.E.2d at 1235). It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *K.T.K.*, 989 N.E.2d at 1235 (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[33] Our courts have long held that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Here, the trial court was not only faced with the DCS's recommendation to terminate Father's parental rights, CASA Key advocated for a similar result. He testified that the absence of any relationship between the Children and Father created a "stability" which allowed the Children "to progress." (Tr. p. 242). Based on his interaction with the Children, CASA Key confirmed that "whenever [the Children] have a change where they come back to something that was in their past, they just regress." (Tr. p. 245). He emphatically reiterated that these Children "can't afford to go back." (Tr. p. 245).

[34] The record supports an abundance of evidence that the Children have been harmed by their past experiences, to the point where testimony indicates that

they may have been—tragically—damaged irreversibly. Both therapists testified to the high stress level of the Children, their aggressiveness, and their emotional problems. Even working with the Children on a regular basis, progress has been very slow, with a limited chance for future success. While the prognosis for ELR is cautiously optimistic, EJR had a "much more damaged ability to attach and interact with somebody else," than his older brother had. (Tr. p. 170).

[35] Duecker emphasized the need to place both Children with families that are totally committed to their needs and have been trained to handle the type of extreme trauma these Children have suffered. At no point during Father's testimony did Father acknowledge his sons' psychological problems, accepted their need for treatment, or even inquired after their general wellbeing.

[36] These young Children have suffered enough trauma; it is time for them to heal. Taking into account the recommendations of DCS and the CASA, along with the evidence of the Children's psychological problems and their progress, Father's lack of meaningful remediation or acceptance of his Children's needs, we agree with the trial court's determination that there is clear and convincing evidence that termination of Father's rights is in the Children's best interests.

## CONCLUSION

[37] Based on the foregoing, we conclude that the trial court did not clearly err as DCS presented sufficient evidence to support the termination of Father's parental rights.

[38] Affirmed.

[39] Robb, J. and Pyle, J. concur